# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 1:19-CR-253 |
| v. | The Honorable T.S. Ellis, III |
| KRISTOPHER LEE DALLMANN, | |
| DOUGLAS M. COURSON, | |
| FELIPE GARCIA, | |
| JARED EDWARD JAUREQUI, a/k/a Jared Edwards, | |
| PETER H. HUBER, and | |
| YOANY VAILLANT, a/k/a Yoany Vaillant Fajardo, | |
| *Defendants*. | |

### GOVERNMENT'S RENEWED MOTION REQUESTING
### CONFIRMATION OF WAIVER OF ATTORNEY-CLIENT PRIVILEGE

Pursuant to the Court's January 15, 2020 memorandum opinion and order, the United States of America, by and through the undersigned, respectfully moves this Court for an order finding that Defendant Kristopher Lee Dallmann has waived attorney-client privilege as to legal advice received regarding the operation of Jetflicks. As described below, Mr. Dallmann operated Jetflicks as an illegal streaming service for years before supposedly approaching an attorney for legal advice. Moreover, he and his co-conspirators routinely misrepresented to third parties the true nature of Jetflicks and hid the fact that they managed an illegal streaming service. Finally, during a consensual interview with the FBI, Mr. Dallmann disclosed that he

had sought advice from an attorney regarding running a commercial streaming service, described to the FBI some of the legal advice he received, indicated he relied upon that advice, and advised that the FBI would find in his residence a legal memorandum drafted by the attorney with whom he consulted. This conduct is more than sufficient to find a waiver of attorney-client privilege.

## PROCEDURAL BACKGROUND

On August 27, 2019, a grand jury in the Eastern District of Virginia returned a multicount indictment against Mr. Dallmann and seven others. With respect to Mr. Dallmann, the grand jury charged him with: (a) one count of conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. § 371; (b) two counts of criminal copyright infringement by reproduction or distribution and aiding and abetting, in violation of 17 U.S.C. §§ 506(a)(1)(A) and 106(1) and (3), as well as 18 U.S.C. § 2319(b)(3) and 2; (c) two counts of criminal copyright infringement by public performance and aiding and abetting, in violation of 17 U.S.C. §§ 506(a)(1)(A) and 106(4), as well as 18 U.S.C. §§ 2319(b)(3) and 2; (d) three counts of money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and B(i) and 2; and (e) one count of money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(3)(A) and (B) and 2.

On December 26, 2019, the government filed a motion asking the Court to order the defendants to inform the Court and the government in advance of trial whether they plan to assert an advice-of-counsel defense and to find that Mr. Dallmann had waived his attorney-client privilege with respect to any legal advice he received on the operation of Jetflicks. (*See* Gov't Mot., Dkt. 148.) The Court held a hearing on the motion on January 10, 2020, and subsequently issued a memorandum opinion and order. With regard to the government's request that the Court order the defendants to declare any advice-of-counsel defense well in advance of trial, the

Court granted the motion and ordered any defendant who intends to assert such a defense to provide notice and discovery no later than ten days before trial. With respect to the government's request for confirmation that Mr. Dallmann had waived his attorney-client privilege, the Court ruled that the government had not submitted sufficient evidence to warrant a finding that he had waived that privilege. The Court also held, however, that this ruling was without prejudice and the government could present "additional evidence . . . concerning Mr. Dallmann's specific disclosures to the FBI" and renew its motion. (Jan. 15, 2020 Order at 2, Dkt. 185.) The government now files that renewed motion.

## FACTUAL BACKGROUND

**A.     Background on Jetflicks**

As alleged in the indictment, the defendants operated Jetflicks, an online, subscription-based service that permitted users to stream (and, at times, to download) copyrighted works without permission from the copyright owners. That was the criminal enterprise.

Yet, while Mr. Dallmann and other conspirators were building the Jetflicks illegal streaming operation, Mr. Dallmann also pursued a separate business idea for Jetflicks. The premise of the other business idea was that Mr. Dallmann would contract with private aircraft owners to digitize their personal DVD collections of movies and television shows so they could watch their favorite movies and shows on digital devices on their planes. (Presumably, this is why he originally chose the name "Jetflicks.") Mr. Dallmann called the aviation-services business the Jetflicks MoVi Entertainment System. (*See* Ex. A at US-112488–112500).)

The Jetflicks MoVi service was built with copyright laws in mind. For example, promotional material seized by the FBI from Mr. Dallmann's residences includes an apparent presentation package about the Jetflicks MoVi service. The package, which includes a notation

that it had been "[a]pprov[ed] by KLD [Kristopher Lee Dallmann] 05-14-13," includes the following explanation of the MoVi System's operation:

> The first step in populating a new system for a customer is verifying the initial collection [of DVDs] to be installed. Due to current copyright laws, Jetflicks or an authorized agent of Jetflicks is required to make an initial inspection of a customers [sic] collection to ensure that all movies being installed have a genuine original.

(*See id.* at US-112488, 112499.)   Similarly, other Jetflicks MoVi promotional materials seized by the FBI states, "New Releases are available for purchase and download the day they come out on DVD."   (*See* Ex. B at US-113069)

Moreover, according to a draft contract for this service, which the FBI also seized from Mr. Dallmann's residences, a copyrighted work only could be on the Jetflicks MoVi system in a specific customer's personal collection if the customer owned an authorized copy.   In fact, this agreement—entitled "Jetflicks™ End User Video Equipment Lease Agreement"—required Jetflicks MoVi clients to "maintain original copies of entertainment titles to maintain compliance with the various copyright holders of said Entertainment Titles."   (*See* Ex. C at 1.)   In other words, for the Jetflicks MoVi service, Jetflicks would digitize the customer's DVDs; if the customer sold or otherwise disposed of any DVD, that work would be removed from the customer's personal digital collection on the MoVi system.   A related document entitled "Pledge and Verification of Media Collection" required a Jetflicks MoVi customer to acknowledge that "an agent of Jetflicks" has "visually verified" that each of the movies and television shows Jetflicks would upload and maintain for the client on the MoVi system "are authorized original copies." (*See id.* at 2.)   This document further required the customer to "certify that if for any reason the 'original' certified media copy is sold, lost or destroyed, either a 'new' copy shall replace the old one or they shall notify Jetflicks in order to have the given media removed from the Jetflicks system."   In addition, the document advised that Jetflicks "has

4

taken all necessary precautions to ensure that applicable copyright laws with respect to the personal viewing of original and authorized media is assured."[1]

This aviation-services business, however, never got off the ground. So, Mr. Dallmann and other conspirators quickly realized that it was much more lucrative to run and expand what amounted to an illegal version of Netflix, that is, a service where they obtained infringing digital copies of television shows from pirate sites, processed and renamed those works, and then streamed and distributed them on an unlimited basis to paying subscribers.

Specifically, the evidence will show at trial that the illegal Jetflicks streaming model worked like this: Mr. Dallmann and the other conspirators developed, refined, and used automated tools and computer scripts to amass a huge inventory of tens of thousands of illegal television shows from some of the most popular torrent sites in the world, such as The Pirate Bay, RARBG, and TorrentDay, as well as some of the largest Usenet NZB index sites, such as NZBplanet, NZBgeek, and NZB Finder. Indeed, Jetflicks claimed to offer over 183,200 different television shows—far more content than legitimate streaming services such as Netflix, Amazon Prime, Hulu, and Vudu. Once the conspirators downloaded, processed, and stored those television episodes, they made them available to tens of thousands of subscribers around the United States for unlimited streaming and/or downloading. Because Jetflicks sourced television programs from pirate sites, it did not pay for the original works or pay any license fees to copyright owners for the use of those works.

Significantly, Jetflicks was an illegal business that had to rely heavily on other legitimate

---

[1] Technically, the Jetflicks MoVi business model would violate the anti-circumvention provisions of the Digital Millennium Copyright Act (DMCA) because Jetflicks would be breaking the digital rights management on customers' DVDs for commercial advantage or private financial gain. *See* 17 U.S.C. §§ 1201(a)(1) and 1204. However, the business model otherwise generally sort of tracks copyright law.

companies to operate, including banks, payment processors, and the like.  To avoid being shut down by these companies, conspirators would try to hide the illegal streaming business and pretend to be just an aviation-services business.  As part of this fiction, Mr. Dallmann and other conspirators would tell service providers and vendors that Jetflicks focused on in-flight entertainment for private planes and that its internet domain was *jetflicks.com* rather than *jetflicks.mobi*, the actual primary domain for the illegal streaming service.  For example, beginning in November 2016, Jetflicks used a company called Stripe to process subscriptions for the *jetflicks.mobi* illegal streaming service.  However, the Jetflicks Stripe account listed the domain as "*jetflicks.com*" and Mr. Dallmann described his business to Stripe as follows: "Private and Corporate aviation entertainment system sales, service, and subscription services.  We invented the first entertainment system for private aviation that is classified as carry-on equipment."  (*See* Ex. D at 1.)  There is no mention of *jetflicks.mobi* or that the Jetflicks Stripe account would in fact process subscriptions for Jetflicks' business of streaming and distributing infringing television programs.  In fact, when confronted by Stripe shortly after opening his account, Mr. Dallmann lied, stating he was just using Stripe for the "3,500 active customers" of his "aviation" business.  (*See* Ex. E at 2.)  Similarly, the application for a Wells Fargo account, which Mr. Dallmann opened for Jetflicks on October 31, 2016, described Jetflicks's business as "IN FLIGHT ENTERTAINMENT FOR PRIVATE JETS."  (*See* Ex. F at US-126843.)

Along these lines, conspirators would lie to customers by suggesting that the streaming business was licensed.  Conspirators knew that they were downloading television programs from torrent and Usenet NZB sites using piracy tools such as Sick Beard/Sick Rage but they would falsely suggest to customers complaining about missing television shows that the Jetflicks "legal department" was working on and negotiating "contracts" with the copyright owners.  A

couple of examples are below:[2]

| From | Time | Message |
|---|---|---|
| S.M. | 2010-12-31 04:59:40 | I was wondering when and if possible when you are going to update the rest of CSI?   I\'ve been waiting and checking everyday to see if you\'ve added the rest of the seasons and u haven\'t . . . . |
| Grant – Support | 2010-12-31 12:03:38 | Hello, Yes the CSI issue is in the hands of the legal department.. they have to work their voodoo magic and get the show acquired.. and every show is different..some are easy .. some are a lot of red tape.. so that is the issue there. . . . –JF |

| From | Time | Message |
|---|---|---|
| T.P. | 2011-01-22 16:16:24 | I still don\\\'t see \\\"damages\\\" or the earlier \\\"ncis la\\\" |
| T.P. | 2011-01-22 16:19:36 | also what about \"southland\" season 1 and 2 |
| JF – Support | 2011-01-23 04:32:46 | all those things are hung up in the legal department.   Once things get released on DVD then the contracts change with the providers.   So we wait for them to get released for the system. sorry I don't have better news for you.   –JF |

In fact, Jetflicks did not have a "legal department" or any contracts or licensing agreements with television studios, producers, or providers.

**B.    Mr. Dallmann's Assertion of an Advice-of-Counsel Defense**

On November 16, 2019, FBI agents interviewed Mr. Dallmann.[3]   In that interview, which was not recorded, Mr. Dallmann at first claimed he only operated an aviation-services

---

[2]  These communications between Jetflicks conspirators and Jetflicks subscribers were found within a SQL database belonging to Jetflicks that co-conspirator Darryl Polo maintained within a Google account that he controlled.

[3]  Attached to this filing as Exhibit G is a sworn affidavit from FBI Special Agent Timothy Lynch, who was the lead interviewer of Mr. Dallmann.   Like the FD-302 that Special Agent Lynch drafted following his interview of Mr. Dallmann, the attached affidavit details Mr. Dallmann's statements regarding Jetflicks.   The attached affidavit, however, focuses on Mr. Dallmann's statements about the legal advice he sought and received for Jetflicks.

business. He soon conceded, however, that this aviation business only had two customers. Mr. Dallmann asked to take a break and, upon resuming the interview, he confessed that his aviation-services business was unsuccessful and that is why he turned to copyright infringement. Mr. Dallmann admitted to downloading copyright television programs from various websites and file sharing networks and illegally streaming them through Jetflicks, and confessed that he had been downloading copyrighted television shows as early as 2007.

While speaking to the FBI agents, Mr. Dallmann claimed he paid $3,000 to an unidentified attorney for legal advice with regard to Jetflicks' streaming services. According to Mr. Dallmann, the attorney provided three categories under which Mr. Dallmann could operate Jetflicks. Mr. Dallmann suggested that one category was he had to remove content after a copyright owner complained; if he did not, then the copyright owner could sue him.[4] Mr.

---

[4] Presumably, Mr. Dallmann was referring to the "safe harbor" provision of the DMCA in which a copyright owner can demand that a website owner or internet service provider take down a specific infringing work and then sue if the work is not taken down. *See* 17 U.S.C. § 512. Yet, this "safe harbor" does not apply to persons such as the Jetflicks conspirators who were well aware of the infringing activity and received a financial benefit directly from it.

In any event, Jetflicks did not even conduct itself within the attorney's supposed "first category." For instance, on July 22, 2011, Mr. Dallmann and Jetflicks received a cease-and-desist letter from HBO demanding that Jetflicks immediately cease showing numerous infringing HBO television programs including "True Blood." (*See* Ex. H at US-110544.) It appears Jetflicks initially complied with this cease and desist letter given customer complaints. On July 29, 2011, for example, a subscriber submitted a ticket to Jetflicks customer support asking, "Ok....where did True Blood go?!" One of the conspirators then replied, in relevant part, "Contract renewals and negotiations are in progress with HBO. They have a new HBO-ToGo mobile phone app now... so you can understand how they want it all on their app now. We will keep working on it but nothing moves fast with that sort of thing." In fact, that was a lie; Jetflicks was not negotiating anything with HBO or trying to renew any contract. And on June 27, 2012, the following "canned" customer support response was added to the Jetflicks Support Database: "True Blood is a HBO production to which HBO has exclusive distribution rights. These rights prohibit us from offering True Blood in our lineup."

Nonetheless, on April 24, 2017, an undercover FBI agent who had subscribed to Jetflicks

Dallmann did not identify the other two categories. Mr. Dallmann further noted to the agents that a memo from the attorney detailing the three permissible categories would be among the records seized by the FBI.

Mr. Dallmann also told agents that Jetflicks received a cease-and-desist letter from the MPAA (this letter was served on Jetflicks around November 16, 2012). (*See* Ex. I.) Mr. Dallmann claimed he brought the letter to the attorney who stated it looked "like it was written by an amateur" and advised Mr. Dallmann to "just ignore it." Mr. Dallmann further told the FBI that he followed the attorney's advice and ignored the letter.

During the execution of search warrants at Mr. Dallmann's residences, the FBI did find a hard copy document that was marked as privileged. Although the government believes Mr. Dallmann waived any attorney-client privilege in this document, the government decided not to review it unless and until it appeared that Mr. Dallmann might assert an advice-of-counsel claim. Given Mr. Dallmann's confession to the FBI agents that he engaged in copyright infringement and the overwhelming evidence against him, it did not seem necessary until now to read that document. To date, neither undersigned counsel nor the FBI has reviewed this document, but it was produced in discovery. Furthermore, in conjunction with the filing of this Motion, a filter attorney will submit the document in question to the Court for *in camera* review.

The government has subsequently learned that in or around 2012 or 2013 an attorney may have visited Jetflicks and opined on the legality of some part of the operation in the presence of Mr. Dallmann and other defendants. It is unclear if this is the same or different attorney than the one Mr. Dallmann described.

---

visited the site and found a number of the HBO works listed in the July 22, 2011 cease-and-desist letter available through the Jetflicks service, including "True Blood," "Boardwalk Empire," "Game of Thrones," "Rome," and "Six Feet Under."

## ANALYSIS

### I. Mr. Dallmann's Voluntary Disclosures to the FBI Constituted a Waiver of His Attorney-Client Privilege

As the Fourth Circuit has explained, a party's voluntary disclosures can waive his or her attorney-client privilege. *See Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 293–94 (4th Cir. 2004) ("A client can waive an attorney-client privilege expressly or through his own conduct."); *see also See In re Grand Jury Proceedings #5*, 401 F.3d 247, 250 (4th Cir. 2005) (holding that because the attorney-client privilege exists for the benefit of the client, the client holds the privilege). The voluntary disclosure of confidential legal advice to a party not covered by the privilege is an "[i]mplied waiver," *Hanson*, 372 F.3d at 294, and it "vitiates the confidentiality that constitutes the essence of the attorney-client privilege," *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998). In other words, an individual cannot place the attorney-client relationship in issue and then claim that the legal advice he received remains privileged. *See United States v. Moazzeni*, 906 F. Supp. 2d 505, 512 (E.D. Va. 2012).

The Fourth Circuit, moreover, rejects limited waivers of attorney-client privilege. Disclosure of confidential legal advice not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure, thereby waiving protection of other documents that relate to the same issue. *See, e.g.*, *Hawkins*, 148 F.3d at 384 n.4; *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) ("Selective disclosure for tactical purposes waives the [attorney-client] privilege."). This is because the attorney-client privilege "impedes the full and free discovery of the truth" and must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984) (internal quotations and citations omitted).

Asserting an advice-of-counsel defense during an FBI interview is the type of conduct that waives attorney-client privilege. Instructive in this regard is *In re Grand Jury Subpoena*, 341 F.3d 331 (4th Cir. 2003). There, two FBI agents conducted a noncustodial interview of an individual who had filed an application for a green card. One of the agents asked the interviewee why he had answered "no" to a particular question on the application, and the interviewee responded that his answer was "under the advice of an attorney" and he identified two attorneys by name. *Id.* at 334, 337.

The government thereafter subpoenaed one of the attorneys to appear before a federal grand jury for purposes of asking the attorney whether he had consulted with the interviewee and whether he had advised the interviewee to respond "no" to a particular question on the application. The attorney declined to answer the questions, citing the attorney-client privilege. The government then asked the district court to compel the attorney to answer the questions. The district court ruled that the interviewee's statements to the FBI constituted an implicit waiver of his attorney-client privilege with respect to the questions at issue, and ordered the attorney to answer the questions posed before the grand jury. *Id.* at 334.

On appeal, the Fourth Circuit affirmed the district court's ruling. The court explained that the interviewee had "clearly stated to a third party" the advice he had received from an attorney. It thus rejected the interviewee's argument that his statements "merely revealed his *conduct—i.e.*, that he had acted in a particular way relying on the legal advice of an attorney— rather than disclosing the substance of that advice." *Id.* at 337.[5]

---

[5] The interviewee also argued to the Fourth Circuit that he had not waived his attorney-client privilege because he had identified two different attorneys without specifying which one had provided the legal advice in question. The Fourth Circuit rejected this argument as well,

11

The holding of *In re Grand Jury Subpoena* applies with equal force here. During the course of a voluntary interview, Mr. Dallmann decided to disclose to the FBI advice he supposedly received from an attorney. He explained to agents why he sought legal advice, described some of the substantive legal advice he received, and indicated he relied on that legal advice. Moreover, Mr. Dallmann disclosed to the FBI the existence of a written memorandum regarding the legal advice provided to him, and noted that it was among the records in his residence that agents were searching and seizing. In sum, these disclosures vitiate the confidentiality of the attorney's legal advice and constitute a complete waiver of the attorney-client privilege as to legal advice provided by that attorney regarding the operation of Jetflicks' streaming service.

---

explaining that one of the FBI agents had testified that the interviewee had specifically identified the attorney who had provided the legal advice at issue. *Id.* at 337.

Presumably the identity of the attorney mattered in *In re Grand Jury Subpoena* because the issue before the court was a motion to compel a specific attorney to testify before a grand jury, and the interviewee had mentioned two attorneys. In contrast, in this case, the fact the government does not know the identity of the advising attorney is immaterial. We are not seeking at this time to compel anyone to testify. Moreover, even though Mr. Dallmann did not disclose the name of the attorney from whom he received legal advice, he did tell the FBI that the attorney had authored a memorandum detailing the categories in which Jetflicks could operate legally, described a portion of that legal advice, indicated he relied upon that advice, and noted that agents would find the document in his residence (this is the document that we have submitted separately to this Court for *in camera* review). By doing so, Mr. Dallmann effectively identified the attorney with whom he consulted.

12

## II. The "Crime-Fraud" Exception to the Attorney-Client Privilege Provides a Separate Basis to Find Waiver of this Privilege

In addition, regardless of Mr. Dallmann's disclosure, the "crime-fraud" exception to the attorney-client privilege provides an independent ground to permit the government to review the document at issue. The elements of the crime-fraud exception are well known: the government must make a *prima facie* showing that the defendant "(1) was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme; and (2) the communications between . . . counsel and the [d]efendant . . . bear a close relationship to the [d]efendant's existing or future scheme to commit a crime or fraud." *United States v. Harris*, No. 2:214-cr-76, 2014 WL 4930811, at *3 (E.D. Va. Oct. 1, 2014) (internal quotations and citation omitted).

Here, a *prima facie* exists given that the conspiracy began prior to when Mr. Dallmann seemed to first confer with an attorney regarding the operation of Jetflicks. In other words, Mr. Dallmann and his co-conspirators consulted an attorney not only to further their future criminal conduct but also their *existing* copyright infringement scheme. Furthermore, the conduct at issue here casts serious doubt on any claim that Mr. Dallmann sought legal advice in good faith. For example, consider Mr. Dallmann's responses to third parties about the nature of Jetflicks. When Stripe questioned him about Jetflicks, Mr. Dallmann claimed it was an aviation services business and did not mention his illegal streaming operation. Similarly, upon initial questioning from the FBI, Mr. Dallmann claimed that Jetflicks was a service through which customers could digitize their personal DVD collection and watch their purchased content on airplanes through mobile devices. If Mr. Dallmann had really sought legal advice in good faith regarding his streaming business and truly believed that Jetflicks was lawful, he would not have lied to Stripe and the FBI and concealed the real nature of his operation. In addition, Mr.

Dallmann's own statements to the agents demonstrate that the legal advice he supposedly received bears a close relationship to his criminal scheme. Indeed, he indicated to the FBI that he relied upon the attorney's legal advice in operating Jetflicks.

The fact that Mr. Dallmann admitted to running an illegal streaming operation before he apparently consulted with an attorney and repeatedly told lies and engaged in evasions about Jetflicks strongly suggests that his motive in seeking legal advice was to try to insulate himself from liability if and when he was caught. This is the type of conduct that the crime-fraud exception is designed to address. *See, e.g., In re Grand Jury Proceedings*, 102 F.3d 748, 751 (4th Cir. 1996) (noting that the crime-fraud exception applies where "the communication furthered, or was intended by the client to further, … illegality" regardless of whether the attorney is aware of the illegality involved (internal quotations and citations omitted)); *United States v. Zolin*, 491 U.S. 554, 556 (1989) ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." (internal quotations and citations omitted)). Accordingly, the crime-fraud exception to the attorney-client privilege provides an independent ground to confirm waiver of any attorney-client privilege.

## CONCLUSION

For the foregoing reasons, the government respectfully asks the Court to issue an order finding that Mr. Dallmann has waived attorney-client privilege with respect to the advice he received regarding the operation of Jetflicks.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Date: February 12, 2020     By:     /s/
Alexander P. Berrang
Monika Moore
Assistant United States Attorneys
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22305
Tel: 703-299-3700
Fax: 703-299-3981
Email: Alexander.P.Berrang@usdoj.gov
Email: Monika.Moore@usdoj.gov

By:     /s/
Matthew A. Lamberti
Senior Counsel
Computer Crime and Intellectual Property Section
United States Department of Justice
1301 New York Avenue, NW, Suite 600
Washington, DC 20530
Tel: 202-514-1026
Email: Matthew.Lamberti@usdoj.gov

**CERTIFICATE OF SERVICE**

hereby certify that on February 12, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filling (NEF) of the foregoing to the attorneys of record for the defendants.

By: _____/s/_____
Alexander P. Berrang
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Alexander.P.Berrang@usdoj.gov