## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 1:19-CR-253 |
| v. | The Honorable T.S. Ellis, III |
| JARED EDWARD JAUREQUI,<br>a/k/a Jared Edwards, | |
| *Defendant*. | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT JARED JAUREQUI'S
### MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

Defendant Jared Jaurequi helped operate Jetflicks—a service modeled after and with more content than Netflix—dedicated to streaming and distributing tens of thousands of individual pirated television shows to paid subscribers around the United States.  In November 2017, Jaurequi readily admitted his crime when interviewed by Federal Bureau of Investigation (FBI) agents during the execution of a search warrant at his home.  Now, following an unsuccessful attempt earlier this year to suppress his confession, the defendant has moved again to suppress his statements as well as certain evidence seized pursuant to the warrant.  As detailed below, the defendant's motion is meritless for at least three reasons, and the Court should deny it.

First, Jaurequi claims that he was in custody during the execution of the search warrant and his interview, that agents refused to give him his cellphone to call his attorney, and that FBI agents coerced him into involuntarily signing a *Miranda* waiver.  All that is plainly false.  Agents repeatedly told Jaurequi that he was not detained, did not restrain or pressure him, and maintained a calm, relaxed atmosphere.  Indeed, hours after the FBI left his house, Jaurequi emailed agents twice offering additional assistance to the investigation and volunteering to address "any other questions or concerns … at anytime, day or night."  Jaurequi and his co-defendant (and husband), Kristopher

Dallmann, then met with agents again a few days later, providing more evidence and statements. Moreover, because Jaurequi was not in custody during the execution of the search warrant or his interview, agents had no reason to *Mirandize* him—but did so out of an abundance of caution. Agents conducted that extra, precautionary step without any coercion, and documented it in a written *Miranda* waiver that Jaurequi initialed and signed.

Second, Jaurequi asserts that the search warrant did not cover his cellphone and that there was a lack of probable cause to seize and search the device. In fact, the search warrant expressly covered cellphones and ample probable cause existed to seize and search the device.

Third, Jaurequi contends that he did not knowingly and voluntarily consent to the FBI using his passcode to extract data from his cellphone. In fact, both Dallmann and Jaurequi freely provided their passcodes (which were identical) to the agents, and Dallmann signed a written consent with various passcodes and passwords including his and Jaurequi's cellphone passcode. Moreover, even if Jaurequi never directly provided his passcode to the agents, it would not matter. Forensic agents would have easily extracted the data from his phone by trying the passcode Dallmann provided or getting access to the phone's contents another way.

Accordingly, Jaurequi fails to meet his burden of proof to suppress and the Court should deny his motion.

## PROCEDURAL BACKGROUND

On August 27, 2019, a grand jury in the Eastern District of Virginia returned a multicount indictment against Jaurequi and seven other individuals. Jaurequi was charged with one count of conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. § 371.

Two defendants have pleaded guilty in this case, and Jaurequi and five co-defendants are set to go to trial beginning on January 19, 2021.

On January 6, 2020, Jaurequi filed a motion to suppress statements he made to the FBI on November 16, 2017.  In his motion, Jaurequi made a number of boilerplate claims regarding how his statements to the FBI were "involuntary," he was "functionally under arrest," and the like, citing many of the cases Dallmann discusses in the instant motion. (Jaurequi's Motion to Suppress Statements, Dkt. 162.)  However, Jaurequi did not provide any factual support for his claims.

On February 4, 2020, the Court summarily denied Jaurequi's motion to suppress without a hearing because Jaurequi failed to state sufficient facts that, if proven, would justify relief. (Order, Dkt. 195.)  The Court denied the motion without prejudice.

On April 2, 2020, Dallmann filed a motion to suppress statements and evidence, attaching the search warrants for Residences A and B as sealed attachments.[1]  (Dallmann's Motion to Suppress Statements and Evidence, Dkt. 242.)  In fact, those search warrants had been unsealed on September 6, 2019.  Then, on April 7, 2020, Dallmann filed unsealed copies of the two search warrants.  The parties fully briefed this motion and the Court has scheduled the hearing for July 9, 2020.

On June 5, 2020, Jaurequi filed a motion to suppress statements and evidence, making many of the same arguments as Dallmann's April 2 motion.  (Jaurequi Motion to Suppress Statements, Dkt. 162.)  Apparently, Jaurequi only challenges the search warrant for Residence A—which seems to have been Dallmann's and Jaurequi's primary residence—but that is not clear from his motion.  The same day, Dallmann filed a motion to adopt and join Jaurequi's motion and Jaurequi filed a motion to adopt and join Dallmann's motion.  The Court has scheduled a hearing

---

[1] Dallmann owns two houses on the same street, which are referred to herein as Residence A and Residence B for purposes of protecting Dallmann's privacy.  Residence A refers to the residence at issue in the document filed by Dallmann as Exhibit A to his Motion and Residence B refers to the residence at issue in the document filed by him as Exhibit B to his Motion.  He used both locations to operate Jetflicks, and the government executed search warrants at both houses.

on Jaurequi's motion for July 9, 2020.

## FACTUAL BACKGROUND

As alleged in the indictment, Jaurequi and his co-conspirators operated Jetflicks, an online, subscription-based service that permitted users to stream (and, at times, to download) copyrighted works without permission from the copyright owners.  The government will prove at trial with testimony and other evidence—including voluntary admissions Jaurequi made to FBI agents on November 16, 2017—that he conspired to commit criminal copyright infringement.

If the Court were to hold a hearing on the circumstances of the interview, the government expects it would elicit the following facts from Special Agents Timothy Lynch, Lance Shakespear, Alexis Brown, and Jessica Marrone who assisted with the execution of search warrants at Residence A and/or interviewed Jaurequi, as well as John Kern, an FBI forensic examiner who helped with the search.  The government laid out many of these facts already in its previous responses to Jaurequi's first motion to suppress statements as well as Dallmann's motion to suppress statements and evidence.

The search began with a number of FBI agents approaching the front door of the residence at which Dallmann and Jaurequi lived, knocking on the door, and announcing their presence.  Either Dallmann or Jaurequi answered the door and was asked to step outside so that the FBI could conduct a preliminary walkthrough of the house for safety purposes.  The agents going in the house had their guns drawn but did not point the weapons at Dallmann or Jaurequi.

Then, Jaurequi and Dallmann, who were in their underwear but were not restrained, stood outside with Special Agent Lynch for five to ten minutes.  Special Agent Lynch explained why the FBI was there, to which Dallmann stated that there was a misunderstanding.  After the premises were secured, Special Agent Lynch escorted them to a bedroom so that they could get dressed.  *See* Gov't Exh. 1 (search diagram of Residence A, with the bedroom designated by letter "P").

Thereafter, the trio went to a living room (letter "B" in the diagram).  The living room was an open plan area with plenty of space, with no partition between the room and the dinette (letter "C" in the diagram) and kitchen (letter "D" in the diagram), and it was in full view of other agents in the house.  The living room had an L-shaped couch, television, and other furniture. Dallmann and Jaurequi selected the couch to sit on and Special Agents Lynch and Shakespear sat down on nearby furniture.  Special Agents Lynch and Shakespear then explained again what the FBI was looking for, and told Dallmann and Jaurequi that they were not under arrest, were not being detained, and that they could leave at any time.  Both Dallmann and Jaurequi stated they preferred to stay at the house, and Dallmann indicated he wanted to make statements to the FBI.  In addition, Jaurequi said that he wanted to remain with Dallmann.  The agents did not put any pressure on Dallmann or Jaurequi and they seemed very cooperative.

Special Agent Lynch placed two blank forms with a *Miranda* warning on the table in front of both Jaurequi and Dallmann so that they could read them.  Special Agent Lynch read each *Miranda* right and then asked them to put their initials next to that right if they understood it. Special Agent Lynch told them that the initials did not mean that they were waiving the right, only that they understood it.  He also told them to ask him any questions about the rights.  At the end, Special Agent Lynch asked them if they waived each right, and, if they did, to sign the forms.  Both Jaurequi and Dallmann signed the forms acknowledging and waiving each of the rights and consenting to the interview.[2]

---

[2] The advice-of-rights form for both Dallmann and Jaurequi stated in relevant part:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during the questioning.

Special Agents Lynch and Shakespear then began to interview Dallmann and Jaurequi.  At some point Special Agent Lynch contacted Special Agents Alexis Brown and Jessica Marrone, who were assisting with the search of Dallmann's next-door residence (Residence B) and had not participated in the earlier protective sweep of Dallmann's primary residence.  Special Agent Lynch asked Special Agents Brown and Marrone to come to his location.  Upon arriving, the agents saw Dallmann and Jaurequi sitting on a couch in the living room.  The atmosphere seemed calm and relaxed, and one of the subjects was holding a dog when they arrived.  Jaurequi was asked if he wished to talk with Special Agents Brown and Marrone.  Jaurequi agreed. The three then went to the bedroom (letter "P" in the diagram) for the interview, a location that Jaurequi chose.  The agents knew that Special Lynch had gone through Jaurequi's *Miranda* rights with him and that Jaurequi had waived them.  They mentioned these rights and Jaurequi's waiver of them again at the beginning of their interview, and Jaurequi confirmed that he had signed the *Miranda* waiver and knew his rights.  The agents also reminded Jaurequi again that he was not under arrest, was not detained, and was free to go.  Jaurequi sat on his bed and the agents sat nearby.  The atmosphere was friendly.  However, Jaurequi became emotional at times and cried.

During this time, Special Agent Brown and Marrone's weapons were holstered and the defendant never saw those agents with their weapons out.  Neither agent pressured Jaurequi, threatened him, or made any promises to him regarding any cooperation.  Neither agent seized or

---

lf you cannot afford a lawyer, one will be appointed for you before any
questioning if you wish.
If you decide to answer questions now without a lawyer present, you
have the right to stop answering at any time.

Both Dallmann and Jaurequi initialed each of the lines set forth above and then provided written consent to the interview, signing below the statement, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Special Agents Lynch and Shakespear then signed the forms as witnesses.  Jaurequi's initialed and signed advice-of-rights form is attached as Exhibit 2.

searched his phone.  Jaurequi never told them that he wanted to stay with Dallmann or that he wanted to speak to an attorney.

The agents' interview with Jaurequi is summarized in the report attached as Exhibit 3.  In the interview, Jaurequi admitted—among other things—that the Jetflicks streaming service was "illegal" and that it started "out innocent but then money comes into play and people get greedy." He also stated that Jetflicks used an automated tool called SickRage to obtain content through NZB files, and that some of this content had not been distributed on DVDs or even aired yet on television.[3]  During the interview, Jaurequi admitted that he could not pretend that he did not know what was going on at Jetflicks because he was involved in helping customers.  Moreover, he stated that he knew that PayPal closed the Jetflicks account (which was used to process Jetflicks subscriptions) and that he assumed that the closure was because of Jetflicks' copyright infringement, and he also acknowledged that Dallmann told him that HBO had sent a letter a long time ago regarding copyright infringement.  Finally, Jaurequi confirmed that co-defendant Darryl Polo had worked at Jetflicks and then left to start a competing illegal streaming service called iStreamItAll with the same coding as Jetflicks.  Some time after the interview, Jaurequi rejoined Dallmann.

During the execution of the search warrants, agents seized a number of cellphones, including from Residence A an iPhone X with a red case with a serial number ending in 32Z4, and another iPhone X.  Apparently, the former cellphone was Dallmann's and the latter Jaurequi's. John Kern, a forensic examiner with the FBI Computer Analysis Response Team ("CART") in Las Vegas, received the two cellphones.  According to Mr. Kern, he needed the cellphones' passcodes to extract their data to an FBI device so he could leave the phones behind with Jaurequi and

---

[3] SickRage and Usenet NZB sites are discussed in more detail in the indictment. (Dkt. 1, ¶ B and 3c.)

7

Dallmann.  Mr. Kern went up to the agents interviewing Dallmann and Jaurequi and—during a pause in the conversation—requested that they ask Dallmann and Jaurequi for their passcodes, so he could image the phones and extract the data on site, and then return them.  Otherwise, the FBI would need to take the phones and send them to a specialized forensic lab, which would use various techniques to gain access to the data—a potentially lengthy process.  Special Agent Lynch passed the request on to Jaurequi and Dallmann, who responded affirmatively to providing their passcodes.  Around this time, at approximately 7:03 am, Special Agent Lynch completed a written consent for the search of various devices and Jetflicks systems that had been seized including the passcodes and passwords for those devices and systems.  Special Agent Lynch acted as a witness for this consent, which was in writing and signed by both Dallmann and Special Agent Lynch in front of Jaurequi.  This consent is attached as Exhibit 4.[4]  Neither Jaurequi nor Dallmann ever requested an attorney before providing the consent, and both were extremely cooperative.

Special Agent Lynch then provided Mr. Kern with a passcode, which was the same for both Dallmann's and Jaurequi's cellphones (this was also the passcode Dallmann provided for the iPad that agents also seized).  With the passcode, Mr. Kern started the extraction process for both phones on site, but soon realized that it was taking too long.  As a result, he opted to bring the phones back to the FBI forensic lab and extract the data there.  Mr. Kern remembers that the atmosphere in the living room was comfortable and casual, and that the subjects were cooperative.

---

[4] The consent-to-search form stated that Dallmann had been asked by FBI agents to permit a complete search of his iPhone, iPad, and Jetflicks systems and it listed the passcodes and passwords for those devices and systems. The form further read in relevant part:

> I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.

> I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software, and computer peripherals.

According to Mr. Kern, even if Jaurequi never provided the passcode to his cellphone, Mr. Kern

would have tried the passcode for Dallmann's phone and/or the iPad that was seized.  If that did not

work and he did not have any other easy alternatives, Mr. Kern would have sent the cellphone to a

specialized FBI lab to gain access to the contents of the device.  As a result, it was inevitable that

the FBI would have been able to extract the data from Jaurequi's cellphone.

      After the agents completed the search and left, Jaurequi sent FBI Special Agent Clay

Chase—the case agent—an email that stated in part, "This [is] Kris & Jared from today's

meeting…. we … took care in looking for any other information or items that could aid in this

investigation."  Jaurequi then went on to state that the two had found a "Drobo chip" that they

believed would be helpful to the agents' investigation.  As Jaurequi noted, "Once we saw it, we

went next door, to use our neighbor Doug [Courson]'s phone, to call you. We also took a pic of the

Drobo and chip, which is attached to this email. Please let us know if you would like us to submit

this into evidence and the procedure to do so or if you would like us to hang on to it for the time

being?."  Jaurequi added, "Should you have any other questions or concerns please do not hesitate

to contact us through Doug's phone [redacted] … or Email us at [redacted] … or you guys can stop

by at anytime."  Several hours later, Jaurequi then forwarded this email to Special Agent Brown on

behalf of himself and Dallmann, stating:

> I am forwarding you an email we sent to Agent Chase about the Drobo chip. I was
> unable To CC you on it because I couldn't find your card at the time and wanted to
> get the email out ASAP. I am cc'ing him in this email so we don't step on anyone's
> toes.
>
> If you have any other question or concerns, the same goes for you, do not hesitate to
> contact us at anytime, day or night.
>
> Have a safe trip back to D.C. and if we see you all again, we hope that it's on better
> terms than today.

After Special Agent Chase responded to Jaurequi on November 17, 2017, Jaurequi replied, stating

in part, "We were also wondering about our phones…. We … are a little worried as to why they

weren't returned today as we had agreed to."  Special Agent responded, "There was a delay with the copying. [Special Agent] Cox will reach out to you hopefully [on November 20, 2017]." Jaurequi's emails are attached as Exhibit 5.

On November 20, 2017, agents drove back to Residence A and returned the two iPhone Xs to Dallmann and Jaurequi.  On that occasion, Dallmann and Jaurequi continued to cooperate with agents and freely handed over additional evidence in the case including a Drobo 5D hard drive enclosure and a Plextor hard drive that had not been seized a few days before (this was the Drobo and chip to which Jaurequi referred in his emails to Special Agents Chase and Brown).  Dallmann also volunteered more information to the agents.

## ANALYSIS

In the instant motion, Jaurequi offers some of the same legal claims that he made in his first motion to suppress.  (Jaurequi Motion to Suppress Statements, Dkt. 162.)  The government previously addressed those arguments in its opposition to that motion, and incorporates that opposition here by reference.  (Gov't Oppos. to Jaurequi's Motion to Suppress Statements, Dkt. 193).  Moreover, Jaurequi's current motion now adds additional false statements and arguments, many of which are similar to those set forth by Dallmann in his motion to suppress statements and evidence.  (Dallmann Motion to Suppress Statements and Evidence, Dkt. 242 and 248.)  The government previously addressed Dallmann's claims in its opposition to his motion to suppress statements and evidence as well as its sur-reply, and incorporates those filings by reference here. (Gov't's Oppos. to Dallmann's Motion to Suppress, Dkt. 250 and 252).

As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence.  *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).  Only if the defendant establishes a basis for his motion to suppress does the burden shift to the government to prove, by a preponderance of the evidence, that the challenged evidence is admissible.  *United States v.*

*Matlock*, 415 U.S. 164, 177-78 (1974).  As discussed below, like Dallmann, Jaurequi fails to establish any basis for his suppression motion.

I.      **Jaurequi Falsely Claims That He Was In Custody During The Execution Of The Search Warrant And That He Asked To Speak To His Attorney During The Search But The FBI Ignored Him And Violated His Fifth Amendment Rights**

In his motion, Jaurequi asserts that he "was in custody" during the execution of the search warrant and his interview, and that agents "refus[ed]" to give him his cellphone "to call his attorney," in violation of his Fifth Amendment rights.  (Def.'s Motion, at 5-7).  Dallmann made similar untrue claims in his motion.

As with Dallmann, the totality of circumstances surrounding the execution of the search warrant and Jaurequi's interview shows that he was not in custody.  *See, e.g.*, *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013) (listing factors relevant to determining whether a reasonable person would have felt he or she was not at liberty to terminate an interview and was thus effectively in custody).  First, agents told Jaurequi from the beginning of the search that he was not under arrest, not detained, and free to leave. They repeated this a number of times throughout the morning.  Second, Jaurequi was never restrained or otherwise restricted in his movement.  Third, Jaurequi stated that he wanted to stay and speak to FBI agents and he made no effort to depart even though he could have at any time.  Fourth, agents did not put any pressure on Jaurequi.  Fifth, the initial interview with Jaurequi took place in his living room with plenty of space and no partitions around.  He was not separated from his husband or dog.  Sixth, at some point, Jaurequi voluntarily agreed to a separate interview and chose to complete that interview in his own bedroom.  He then returned to Dallmann.  Seventh, no one pointed a weapon at Jaurequi or intimidated him.  Eighth, at least to the agents, the atmosphere seemed calm, relaxed, and friendly.

Significantly, shortly after the execution of the search warrant and interview, Jaurequi emailed Special Agent Brown and the case agent, Special Agent Chase, to continue his cooperation

and further assist the investigation.  Jaurequi stated that he and Dallmann had searched their house for additional information or items that could help the FBI, and had located other computer devices to submit into evidence.  Moreover, Jaurequi added that he and Dallmann were happy to address further questions and concerns, and stated that the agents should "not hesitate to contact us at anytime, day or night."  If Jaurequi was truly "scared, distraught, and confused," "afraid, "intimidate[d]," "coerced," and "in custody" by Special Agent Brown and the other FBI agents during the execution of the search warrant and his interview—as he claims in his motion (Jaurequi Motion, at 2-5)—he never would have sent those emails a few hours after the search ended.

Moreover, three days after the search and interview, FBI agents visited Dallmann and Jaurequi to return the two phones to them.  At that time, Dallmann and Jaurequi freely provided additional physical evidence that had not been seized earlier—including the Drobo and chip mentioned in the Jaurequi emails—and Dallmann volunteered more statements about Jetflicks.

Accordingly, Jaurequi was not in custody during the execution of the search warrant or his interview, had no right to counsel, and the agents did not even need to give him a *Miranda* warning before the interview.  *United States v. Holness*, 706 F.3d 579, 594 (4th Cir. 2013); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).  In fact, the agents were so careful and solicitous before Jaurequi's interview that—out of an abundance of caution—they did give him a *Miranda* warning, which is discussed in more detail below.

In addition, according to FBI agents, Jaurequi never requested the assistance of an attorney at any time. In fact, before being interviewed and after being *Mirandized*, Jaurequi waived each *Miranda* right (including all the rights involving an attorney).  Moreover, he consented to the interview; was extremely cooperative before, during, and after the interview; and made numerous statements to the FBI over the course of the morning and even after the agents left.  Thus, Jaurequi had no right to counsel and, even if he did, he specifically waived it.

12

## II.      Jaurequi Falsely Claims That FBI Agents Coerced Him Into Involuntarily Signing A Miranda Waiver

Next, just like Dallmann did in his motion, Jaurequi claims that the FBI "coerced," "intimidat[ed]" and "commanded" him to sign a *Miranda* waiver."  (Def.'s Mot., at 5-7.) Jaurequi even falsely states that FBI agents never read his rights to him and never permitted him to read or consider them, and that—as a result—he did not make a "voluntary, knowing, and intelligent waiver of his rights."  (*Id.*, at 6-8.)

However, as noted above, Jaurequi was not in custody and agents did not need to give him a *Miranda* warning at all.  But when agents did opt to provide this warning to Jaurequi, they did so without intimidation, pressure, or confusion.

In any event, the government need only establish the voluntariness of a statement by a preponderance of the evidence, and a statement is involuntary only where "the defendant's will has been overborne or his capacity for self-determination is critically impaired."  *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017).  In other words, coercive police activity is a necessary but not sufficient finding for a confession or a *Miranda* waiver to be considered involuntary.  *Id.* at 885 ("It is not enough . . . to simply find coercion.").

Similarly here, the typical characteristics of coercive police pressures are absent.  Special Agent Lynch placed the *Miranda* waiver forms on the table in front of the couch where Jaurequi and Dallmann were sitting (see letter "C" in the sketch).  The forms were upside down so they could read them.  Special Agent Lynch then read each *Miranda* right and asked them to put their initials next to the right if they understood it.  He also told them to ask him questions about any of the rights.  At the end, Special Agent Lynch asked them if they waived each right and, if they did, to sign the forms.  Jaurequi's *Miranda* form shows that he initialed each of the rights and then signed the form stating, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Moreover, before

13

Special Agents Brown and Marrone interviewed Jaurequi in the bedroom, they *again* confirmed with Jaurequi that he had waived his *Miranda* rights and understood them.

At the time Jaurequi waived any *Miranda* rights, he was well aware of why the agents were at his house and the nature of the crime of which he was suspected.  Indeed, over the course of the morning, he admitted his involvement in that offense and his guilt.  Furthermore, the interview was conducted in Jaurequi's own home and there is no indication Jaurequi was subjected to physical or psychological coercion.  Hence, while agents had no need to afford Jaurequi a *Miranda* warning given that he was not in custody, it was perfectly valid.

### III.    Jaurequi Incorrectly Claims That The Search Warrant Did Not Cover His Cellphone And That There Was A Lack Of Probable Cause To Seize And Search That Device

Jaurequi contends that the search warrant for Residence A did not authorize the search and seizure of his phone.  However, contrary to Jaurequi's argument, the affidavit provides ample probable cause that evidence would be found at Residence A showing criminal copyright infringement, among other crimes.  *See* Exh. 6; *see also United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004) (stating that probable cause depends on the totality of circumstances and exists in the context of a search where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found).  Moreover, the search warrant specifically authorizes the search and seizure of cellphones, and the seizure of data from the phones.  *See id*., at ¶¶ 71, 72, 73, 74, 75, and 76; Attachment A-1; and Attachment B; *see also United States v. Phillips*, 588 F.3d 218, 225 (4th Cir. 2009) (noting that law enforcement officers may seize an item pursuant to a warrant even if the warrant does not expressly mention or describe it).  Indeed, as expected, there is considerable evidence on Jaurequi's phone showing that he and Dallmann ran Jetflicks, an illegal streaming business engaged in criminal

14

copyright infringement on a massive scale.[5]

In support of his argument, Jaurequi cites *United States v. Hodson*, 543 F.3d 286 (6th Cir. 2008).  In that case, a detective obtained a search warrant based on probable cause for one crime (child molestation) but the warrant was designed and requested for an entirely different crime (child pornography).  Based on evidence seized pursuant to the warrant, a grand jury charged Hodson with receiving and possessing child pornography.  While it is true the *Hodson* court found the warrant in that case to be invalid, *Hodson* has nothing to do with the warrant at issue here.  The government obtained and executed a search warrant for Residence A for criminal copyright infringement, conspiracy, and aiding and abetting; obtained additional evidence of these crimes; and the grand jury indicted Jaurequi and others for various crimes including conspiracy to commit

---

[5] Communications on Jaurequi's cellphone demonstrate that he worked closely with Dallmann to run Jetflicks' illegal streaming business and to assist Dallmann's efforts to hide Jetflicks' real activities from legitimate companies they needed to use for their operations.  For example, in an August 9, 2016 chat, Dallmann suggested that Jaurequi operate his own "NZB file storage server" that Dallmann could then secretly use for Jetflicks.  Later, on October 24, 2016, PayPal emailed Dallmann that it was suspending Jetflicks' account because "PayPal may not be used to send or receive payments for items that infringe or violate any copyright."  Among other things, PayPal requested that Jetflicks provide PayPal with "a guest login and password for www.jetflicks.mobi, so that [PayPal] may verify that [Jetflicks'] sales and transactions do not violate [PayPal's] Acceptable Use Policy" and supply PayPal "with a valid licensure or proof of authorization from the relevant parties and owners of the movies that states [Jetflicks has] permission to offer their movies on www.jetflicks.mobi."  Then, on October 29, 2016, in a chat stored on Jaurequi's phone, Jaurequi sent Dallmann a proposed response to PayPal to try to block scrutiny and avoid a shutdown.  This draft response falsely claimed that Jetflicks "provides inflight entertainment for the private and executive aviation industry" and also that Jetflicks could not provide PayPal with "a log in and password for access to our website" for two reasons.  First, providing PayPal with "free access to view copyrighted material with no royalties having been paid" would "put our entire company at risk for unlawful practices."  Second, Jetflicks could not supply "valid licensure or proof of authorisation from the relevant parties and owners of the movies that states we have permission to offer their movies … [because that] would put jetflicks in breach of our own confidentiality agreements we have with our clients."  This draft response claimed that PayPal's request that Jetflicks demonstrate that it was not infringing copyright would "requir[e] us to break federal law in order to get our merchant processing account as active again."  On November 3, 2016, Jetflicks signed up to use Stripe instead of PayPal to process Jetflicks subscription payments.

criminal copyright infringement.

## IV.    Jaurequi Erroneously Contends That He Did Not Knowingly Consent To The FBI Using His Passcode To Extract Data From His Cellphone

Next, Jaurequi claims that, even if agents could lawfully search and seize his cellphone based on the search warrant, the government must also show that he gave "knowing and voluntary consent" to provide his passcode.  (Def.'s Motion, at 10.)  In fact, Jaurequi did give such consent and, even if he did not, agents would have been able to extract the data from the cellphone anyway.

As noted above, both Dallmann and Jaurequi voluntarily agreed to provide their passcodes, and they did so even though they were not in custody *and* after waiving their *Miranda* rights, including their Fifth Amendment rights against self-incrimination.  Indeed, Dallmann executed a written consent form agreeing to the search and seizure of his cellphone and a number of devices and systems used for Jetflicks.  And the written passcode Dallmann provided for "cell phone" and "IPad" on the form was the same passcode.  Moreover, that passcode was *also* the passcode for Jaurequi's cellphone.

In addition, Jaurequi and Dallmann clearly understood that—as agents explained to them during the search—if they agreed to provide passcodes for the cellphones, the FBI would be able to extract the data quickly and then return the devices.  Otherwise, the process could take weeks or months.  In fact, Jaurequi sent an email to the FBI the day after the search on behalf of himself and Dallmann specifically stating that they "agreed to" their phones being taken during the search if they were returned to them the next day; the agent responded that there was a delay with "the copying" of the phones and the devices would hopefully be returned the next business day; the FBI *did* give back the phones to Jaurequi and Dallmann the next business day; and on that occasion Dallmann and Jaurequi provided the agents with more physical evidence and made additional statements.  If Jaurequi did not knowingly and voluntarily consent to give the FBI the passcode for his cellphone during the search—as he claims in his motion—then his comments and actions after

16

the search make no sense.

In his motion, Jaurequi does admit that he provided his passcode to agents. However, he claims he did so only after he asked to contact his attorney, after agents made vague suggestions about how he would benefit from cooperation, and only when they finally "command[ed]" him to comply. (*Id.*, at 3 & 10). However, Jaurequi never asked to speak to an attorney (and in fact waived that right) and agents never used any coercion, threats, or force to obtain passcodes for the phones. They simply requested the passcodes to enable the on-site forensic examiner to image the phones on site and promptly return them, and Jaurequi and Dallmann agreed. Hence, the government properly obtained and used Jaurequi's passcode to extract data from his cellphone. *See, e.g.*, *United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019) (denying motion to suppress where Mojisola voluntarily entered her passcode into her phone at an agent's request, even though she was in custody, had not been given *Miranda* warnings, and had not waived her rights against self-incrimination); *United States v. Hernandez*, 2018 WL 3862017, at *4-5 (S.D. Cal. Aug. 13, 2018) (where Hernandez was arrested, asked for an attorney, and then upon agents' request voluntarily demonstrated her passcode [by drawing a pattern on the screen that resembled a square], suppressing the fact that Hernandez demonstrated her passcode for violation of *Miranda* but not suppressing the contents of the phone accessed through the passcode).

In any event, even if Jaurequi had not agreed to provide agents with his password, the forensic examiner would have tried to input into Jaurequi's phone the passcode for Dallmann's cellphone and the iPad, which would have unlocked the device (and even if that did not work, a specialized FBI lab could still gain access to the contents). Thus, obtaining the passcode for Jaurequi's cellphone was a foregone conclusion and the search and seizure of Jaurequi's cellphone data was inevitable. *See, e.g.*, *United States v. Bullete*, 854 F.3d 261, 265 (4th Cir. 2017) (stating that the inevitable-discovery doctrine allows the government to use information obtained from an

otherwise unreasonable search if it can establish by a preponderance of the evidence that law

enforcement would have "ultimately or inevitably" discovered the evidence by lawful means)

(citation and internal quotation marks omitted); *United States v. Apple MacPro Computer*, 851

F.3d 238, 247 (3rd Cir. 2017) (finding that requiring Doe to provide passwords to decrypt hard

drives seized from Doe by the government does not violate the Fifth Amendment privilege against

incrimination where the act of that production is a foregone conclusion that adds little or nothing to

the sum total of the government's information); *Nix v. Williams*, 467 U.S. 431, 437-51 (1984)

(holding that, even though police obtained Williams' incriminating statements regarding the

location of a child's body in violation of his Sixth Amendment right to counsel, the evidence

showed that the body inevitably would have been found anyway and thus the evidence should not

be suppressed).

In response, Jaurequi cites various decades-old cases, all of which involve law enforcement

officers obtaining consent after conducting warrantless illegal searches, arresting and detaining

subjects without probable cause, and/or not giving *Miranda* warnings after arresting subjects.[6]

---

[6] *See, e.g.*, *United States v. Timberlake*, 896 F.2d 592, 595-96 (D.C. Cir. 1990) (holding that where officers illegally entered apartment without warrant, officers could not rely on later consent of renter to justify search); *United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988) (reversing district court for admitting evidence seized as a result of Jones' inculpatory but involuntary statement where officers blocked Jones' car with three police cars—effectively putting him in custody—and never gave *Miranda* warnings); *United States v. Thompson*, 712 F.2d 1356, 1362 (11th Cir. 1983) (ruling that officers could not rely upon Thompson's consent because it was the fruit of his unlawful detention, resulting in part from an officer retaining Thompson's driver's license); *United States v. Gooding*, 695 F.2d 78, 84 (4th Cir. 1982) (holding that where officers illegally seized Gooding at airport, they could not rely upon his consent to search); *United States v. Taheri*, 648 F.2d 598, 601 (9th Cir. 1981) (holding that where agents conducted illegal search with no probable cause and then obtained a warrant, arrested Taheri, and then obtained his consent to other searches, agents could not rely upon that consent); *United States v. Sanchez-Jaramillo*, 637 F.2d 1094,1100 (7th Cir. 1980) (where agents detained and then arrested Cruz without probable cause, ruling that Cruz's subsequent statements and consent to search would be suppressed with regard to Cruz but could be used against Sanchez-Jaramillo); *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977) (holding that McCaleb's consent to search was not free and voluntary where he was arrested without probable cause in unfamiliar surroundings, given *Miranda* warnings, told to either consent to the search or remain in detention, and did not acquiescence to the search either orally or in writing).

18

None of those cases have anything to do with the instant matter. Here, agents executed a search warrant, seized Jaurequi's phone pursuant to the search warrant, obtained his passcode to search and seize the phone, extracted the data from the phone, and returned it to him. Jaurequi also cites a couple of cases where police clearly coerced the defendants into providing consent to searches.[7] However, both of those cases involve warrantless searches with coercion or intimidation. That was not the situation here. Ironically, one case listed by Jaurequi actually supports the government. *See United States v. Battista*, 876 F.2d 201, 207 (D.C. Cir. 1989) (holding that Battista voluntarily consented to search even though he was detained because the totality of circumstances suggested that the consent was voluntary including the fact that officers told Battista he did not have to consent and the encounter was marked by a civil, conversational tone, and cooperative attitude).

Finally, Jaurequi cites *Riley v. California*, 573 U.S. 373, 386 (2014), for the proposition that cellphones have a lot of personal data. However, in that case, the Supreme Court held that officers must generally secure a warrant before searching digital information on an arrestee's cellphone. Here, agents had a search warrant and Jaurequi was never arrested.[8]

---

[7] *See United States v. Maragh*, 756 F. Supp. 18, 21 (D.D.C. 1991) (ruling that where officers were holding Maragh's arm and his bag and did not advise him that he had the right to refuse to consent to a search of his bag, Maragh silently acquiesced to a search because he was intimidated); *United States v. Recalde*, 761 F.2d 1448, 1452-54 (10th Cir. 1985) (where officers pulled over Recalde in rural area and kept possession of his driver's license, automobile registration, and speeding ticket and escorted him to nearby police station, holding that Recalde's consent to search in the police station was coercive and thus invalid).

[8] Jaurequi also cites *United States v. Djibo*, 151 F.Supp. 3d 297 (E.D.N.Y. 2015). In that case, Customs and Border Protection officers escorted Djibo—a passenger departing on an international flight from the U.S. into a private area for inspection, and an officer asked him for his cellphone number and passcode, which he provided. Djibo was arrested and read his *Miranda* rights, which he invoked. The government then extracted 921 pages of information from the phone and subsequently obtained a search warrant for the phone, acquiring additional data. The court found that Djibo was not free to leave the border inspection area, and so was effectively in custody. Thus, it suppressed his statements in which he provided his phone number and passcode. The court then declined to apply the holding of *United States v. Patane*, 542 U.S. 630, 642-43 (2004) (which held that failure to give suspect *Miranda* warnings does not require suppression of physical fruits of suspect's unwarned but voluntary statements) for several reasons including that Djibo invoked

19

In short, Jaurequi's argument is nothing but a smoke screen to disguise the fact that agents seized and searched his cellphone according to a valid warrant, and he freely and voluntarily provided his passcode to agents.  Moreover, even if he did not freely and voluntarily provide his passcode, Dallmann certainly supplied the passcode for both his and Jaurequi's cellphones and iPad, and the extraction of data from Jaurequi's phone was inevitable.  Accordingly, the government's search and seizure of Jaurequi's cellphone was valid as was the search and seizure of data from that device.

---

his rights once he was later given a *Miranda* warning, officers had no reason to obtain Djibo's passcode at the airport given that they were searching for contraband or currency and found neither, and cellphones have a lot of sensitive data.  However, in the instant case, agents seized and searched the cellphone pursuant to a lawful search warrant, the warrant clearly covered the cellphone and its data, the agents had a good reason to request the passcode (so they could extract the data on site and return the phone to Jaurequi), Jaurequi was never detained or arrested, and Jaurequi waived his *Miranda* rights.  Thus, that case is simply inapposite.

## CONCLUSION

Jaurequi's motion is meritless. He fails to meet his burden to suppress his statements or other evidence, and for the reasons set forth above, the government asks the Court to deny his motion.

Respectfully submitted,

Date:   June 19, 2020

G. Zachary Terwilliger
United States Attorney

               /s/
Matthew A. Lamberti
Special Assistant United States Attorney,
  Eastern District of Virginia
Senior Counsel,
  Computer Crime and Intellectual Property Section
United States Department of Justice
1301 New York Avenue, NW, Suite 600
Washington, DC 20530
Phone: (202) 514-1026
Email: Matthew.Lamberti@usdoj.gov

               /s/
Alexander P. Berrang
Monika Moore
William E. Fitzpatrick
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Alexander.P.Berrang@usdoj.gov
Email: Monika.Moore4@usdoj.gov
Email: William.Fitzpatrick@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filling (NEF) of the foregoing to the attorneys for the defendants.


By:     _____/s/_____
        Matthew A. Lamberti
        Special Assistant United States Attorney,
          Eastern District of Virginia
        Senior Counsel,
          Computer Crime and Intellectual Property Section
        United States Department of Justice
        1301 New York Avenue, NW, Suite 600
        Washington, DC 20530
        Phone: (202) 514-1026
        Email: Matthew.Lamberti@usdoj.gov